STATE OF MAINE
*vs.*
FRANCES SILVA

Cumberland.    Opinion, September 18, 1957.

*Arthur Chapman, County Attorney,* for plaintiff.

*Lynn M. Bussey,*
*Frank O. Dunton,*
*Basil A. Latty,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, BELIVEAU, TAPLEY, SULLIVAN, DUBORD, JJ.

WEBBER, J.   John Silva, III was born on October 26, 1954, unwanted and unloved, the child of an unwed mother. On February 1, 1955 he was legally adopted by John and Frances Silva and given the name which he was to bear for the few months of his troubled life. On February 28, 1956, this sixteen months old baby died as a result of injuries incurred under most peculiar circumstances. Autopsy and investigation were followed by indictment charging the respondent, Frances Silva, with manslaughter. A jury heard the evidence and returned a verdict of guilty. Appeal from the denial of a motion for new trial and exception to the admission of a single bit of evidence bring the matter before us.

In the short span of his life, the decedent had acquired a most extraordinary medical history. It is upon this history that the State relies primarily for proof of the guilt of this respondent. At the time of his adoption, there is no doubt but that this baby, then three months old, had suffered from neglect at the hands of his natural mother. The Silva family physician, Dr. Applin, found him to be thin, pale, malnourished and suffering from the early stages of rickets. Symptoms of rickets were at once arrested and had no adverse effect on the bone structure. Dr. Applin found no evidence of fracture. Only two months later, however, he observed the results of the first of a series of unhappy episodes in the baby's life. Asked by the respondent to treat the child for a cold, Dr. Applin perceived a "noticeable"

swelling in the area of the left thigh, and upon x-ray examination discovered a complete fracture of the femur which had started to heal. For this injury the child required hospitalization and traction. The respondent professed ignorance as to the occurrence of any injury to the thigh although the jury could properly infer from the testimony that the swelling would be noticeable to any person attending the baby. Medical testimony makes it clear that the bones of children of this age are more flexible and rubbery than those of adults and are not easily broken. The respondent recalled that a few days before the fracture was detected by the doctor, the baby was riding in an auto chair attached to the back of the divided front seat of her automobile. It becoming necessary to stop the car abruptly, the back of the seat with the auto chair attached tipped forward. The baby was not dislodged from his chair. He cried briefly but was quickly pacified. The child apparently obtained a well healed femur as a result of treatment.

Except for giving some routine immunization shots, Dr. Applin's services were not again required until he received an emergency call from the respondent on February 24, 1956. Upon arrival, the physician discovered the baby in a state of shock and apparently suffering a severe head injury. He was then given by the respondent a history of an accidental fall. The baby is alleged to have climbed to a standing position on the seat of his high chair, and then to have fallen striking his head on the hard kitchen floor. The defense suggests that there was a toy on the floor near the chair on which the child's body may have struck. The respondent states that she was then in the kitchen with the child, but several feet away preparing his food. They were alone in the house at the time. The baby was immediately hospitalized. On February 27th the skull was opened by operative procedure in an effort to relieve pressure from internal bleeding. On the day following, the child died. An autopsy was performed by Dr. Porter, an experienced pa-

thologist. The results of that autopsy together with the history of the fractured femur (not covered by autopsy) reveal that in the space of about a year, this child had an almost unparalleled succession of traumatic experiences. His body showed evidences of the following:

1. Old fracture of the left femur (discussed above).

2. A sub-dural hematoma on the left side of the head which, based on the quantity, quality and color of the fluid and the extent of formed membrane, was about two to four months old.

3. A line fracture of the 3rd to 9th rib inclusive on the right side which, based on the formation and absorption of callus and the formation of new bone, was two to three months old.

4. A sub-dural hematoma on the right side of the head which, based on the same factors, was about four weeks to two months old.

5. A fresh line fracture of the 3rd to 8th ribs inclusive on the left side which, based on the same factors, was only a few days old.

6. A large hematoma in the scalp which was only a few days old.

7. In the same area a fracture of the skull four to four and one-half inches long extending from the midline of the top of the skull to a point back of the right ear, and which was a few days old.

In addition, there were black and blue spots on the left forehead, left lower chest and on the back, with a tiny abrasion on the tip of the nose. It was noted that there were no abnormalties of bone structure and no indication of weakness which might cause the bones of this child to break more readily than those of any normal healthy child.

There was no other pathology which offered any possible explanation of the results noted other than trauma.

The respondent states that she was not aware that the child had ever received a fracture of the ribs or severe internal injuries about the head as he obviously did some time before February 24, 1956. She recalls but one incident in that period when he is alleged to have fallen into the fireplace, but did not appear to be seriously hurt.

As the evidence developed, the issues for the jury were relatively simple. There was no question of suicide by a child of this age. Did this child, then, die as a result of an unfortunate accident or accidents? Or did it die as the result of unlawful and violent force applied by some person? If so, was that person the respondent? This is the type of issue which a jury is well qualified to determine. The jury was fully and properly instructed that the respondent wore the protective mantle of innocence and that the State must strip that mantle from her by proof of guilt beyond a reasonable doubt. The jury has announced by their verdict that they entertained no reasonable doubt that the respondent produced the death of her adopted baby by some unlawful application of external force. The jury has said in effect that an hypothesis that John Silva, III died by accident is not rational or reasonable upon this evidence and the inferences properly to be drawn from it. Many crimes are committed in secret. In such case the State must forge a chain of circumstances, each essential link proven beyond a reasonable doubt, and the whole pointing inexorably to guilt as the only rational hypothesis. When, as here, the alternative is accidental causation, the circumstantial evidence must rule out accident as a rational or reasonable explanation of death. *State* v. *Merry,* 136 Me. 243; *State* v. *O'Donnell,* 131 Me. 294; *State* v. *Terrio,* 98 Me. 17. How, then, does this evidence meet this rigorous test?

As already noted, the first injury in point of time was a fractured femur. The jury might reasonably take into ac-

count the relative infrequency of such fractures in children of this age. In weighing the suggested explanation, the jury could properly consider whether it was probable that the mere tipping forward of the automobile seat, without throwing the child out of the seat and without producing any violent contact between the injured member and any hard object or surface, would cause a fracture in that portion of the body. They might find it difficult to believe that the effects of such a fracture would not have been observed by the respondent as she bathed and attended the baby. Such disbelief might logically raise an inference that the respondent had concealed some guilty knowledge of the true causation of this fracture.

The jury could find on the evidence that at some time two to three months before his death the child fractured seven ribs on the right side and at some time two to four months before his death suffered a severe sub-dural hematoma on the left side. No explanation based on accidental causation is suggested by the defense for these injuries unless it be found in the alleged fall into the fireplace. The incident as related by the respondent indicates that she and the child were alone in the living room about a month or less before the death; that the baby was learning to walk; that the fireplace was equipped with andirons and a metal mesh screen of the curtain type which stood open two or three inches at the center; that the baby took two or three steps toward the fireplace, stumbled and fell into it through the screen; that there was soot on his forehead but no other indication of injury; and that he cried only briefly and showed no later effects from the fall. The jury could properly question whether the force of such a fall would not be partially broken by the resistance of the screen and whether such force would be likely to produce either or both of the severe injuries noted. They might also properly question whether, if such a fall took place, it was related in time to the impact or impacts which produced these particular injuries. They

might properly reject the alleged incident as a rational explanation of these injuries which, on the evidence, they might conclude were incurred some time before the fall is alleged to have occurred.

The evidence would warrant a finding by the jury that at some time between four weeks and two months prior to the death, and in any event at a time more recent than the episode or episodes causing the injuries discussed above, the child suffered a sub-dural hematoma on the right side of the head. They might conclude that no explanation was suggested as to causation of this injury unless it was related to the alleged fall into the fireplace; but in that case, of course, the fireplace incident could not relate to the fractured ribs and the hematoma on the left side above referred to.

The jury could find that on February 24, 1956 the child suffered a severe skull fracture and scalp hematoma on the right side of the head and at or about the same time a fracture of six ribs on the left side. There was evidence to justify a conclusion on their part that an accidental fall from a highchair such as the respondent described would not account for the injuries sustained taking into account their nature and extent, their location on the body, and the degree of force which would ordinarily be required to produce them.

The medical testimony in this case was most revealing. Capable medical witnesses are often reluctant to give categorical denial to the suggestion that, medically speaking, a particular thing is "possible" or "could happen." Their obvious caution is prompted by their recognition of the yet unfilled gaps in medical knowledge. As expert witnesses, testifying with strict regard for truth and accuracy, they frequently speak with great positiveness and certainty only when the question relates to what is probable and likely. Such an answer they can base on their observation and ex-

perience. A jury is entirely justified in giving more weight to the probabilities as to the causation of traumatic injuries than they do to mere possibilities. The instant case furnishes an excellent example of this differentiation.

Dr. Derry, the medical examiner who viewed the autopsy, stated that it was unlikely that the fresh rib fracture in a child of this age was caused by a fall from a highchair as related by the respondent. It was his opinion that such an injury would require some sort of severe crushing causing the soft and flexible baby ribs to bend beyond their limit and snap. He considered it highly improbable that the skull fracture he observed was caused by the fall described, without the application of any additional force. He admitted the possibility of such causation. He denied, however, even the possibility that *all* the fresh injuries sustained could have been caused by such a fall alone. The toy, he felt, might account for some of the bruises, but not for all of the fresh injuries. He further stated that in his opinion neither the old rib fractures, nor the fractured femur, nor any of the hematomas could have been caused by the fall from the child's own height into the fireplace as described. It was his opinion that there would have to be a history of more accidents of greater severity to explain all of the many injuries sustained by this child.

Dr. Applin conceded that this skull fracture "could happen" as the result of a fall from the chair; also that it was "possible" that the fresh rib fracture could have been caused in like manner although he did not think that fracture was consistent with a fall from the chair. He stated unequivocably, however, that the several fresh injuries present on February 24th could not *all* have occurred in one such fall.

Dr. Rand, orthopedic surgeon and consultant in connection with the fracture of the femur, characterized the sustaining of the skull fracture and fresh rib fracture in the

manner alleged as "possible" but "hard to imagine." He noted that fractured ribs in children of this age are very rare. He termed it "highly improbable" that *all* of the fresh injuries were sustained in one such fall. He also was of opinion that the rib injuries were more consistent with severe pressure than with a blow.

Dr. Porter was certain that the fresh injuries were not consistent with a fall from the chair, even onto the toy. He also considered the rib injuries to be consistent with crushing, a "pressure type of injury." It was his opinion that the rib injuries were consistent with a fall from a much greater height or with a very forceful blow with a hand or fist. He established the cause of death as bleeding from the skull fracture into the old sub-dural hematoma on the right side, aided by interference with respiration from the fresh rib injuries. He recognized that if a child's head came forcefully into contact with an andiron, it would be probable that a hematoma could result.

Dr. Bidwell, the neurosurgeon who treated the child for the injuries of February 24th and who subsequently operated, stated that the impact required to produce a sub-dural hematoma such as he observed would be greater than that which would be produced by a fall from the baby's own height into a fireplace. It was his opinion that one would have to assume that the metal screen offered no resistance whatever and the child entered the fireplace at high velocity to account for a sub-dural hematoma as a resulting injury. He pointed out also that a baby's skull is not easily fractured.

The jury could properly weigh the medical testimony in the light of known facts. It could consider that this child was not running and playing outside the home and exposed to the normal accident hazard of an older child. This child was under constant supervision and observation such as to make it highly improbable that it could be involved in a

series of accidents consistent with the severity of the injuries without the knowledge of the respondent. The jury could properly conclude that the incidents related do not adequately explain and are not consistent with the number and extent of injuries. As to the injuries inflicted on February 24th, the jury could reasonably infer that the alleged fall from the highchair was accompanied by some undisclosed force and violence consistent with all the injuries then sustained, or that no such fall took place and the real nature of the episode has not been revealed.

The history of the old injuries has probative value in determining whether or not accidental causation has been eliminated beyond a reasonable doubt. For this child to have received any one of these serious injuries solely as a result of accident in the course of its comparatively sheltered and circumscribed life would be abnormal. As these abnormal results are multiplied, instance upon instance, the likelihood of accidental causation diminishes to the vanishing point. The rule of logic and reason is set forth in Wigmore on Evidence, 3rd Ed., Vol. II, Sec. 302, Page 196. Here the author is discussing proof of intent but the text has logical application to proof negativing accidental causation. He states:

> "The argument here is purely from the point of view of the doctrine of chances,—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but the oftener similar instances occur with similar results, the less likely is the abnormal element to be the true explanation of them. * * * * In short, sim-

ilar results do not usually occur through abnormal causes; and the recurrence of a similar result * * * tends (increasingly with each instance) to negative accident * * * *."

To the same effect the often cited case of *State* v. *Lapage,* 57 N. H. 245, wherein the court said at page 294:

"Another class of cases consists of those in which it becomes necessary to show that the act for which the prisoner was indicted was not accidental, -- e.g., where the prisoner had shot the same person twice within a short time, or where the same person had fired a rick of grain twice, or where several deaths by poison had taken place in the same family, or where children of the same mother had mysteriously died. In such cases it might well happen that a man should shoot another accidentally, but that he should do it twice within a short time would be very unlikely. So, it might easily happen that a man using a gun might fire a rick of barley once by accident, but that he should do it several times in succession would be very improbable.

So, a person might die of accidental poisoning, but that several persons should so die in the same family at different times would be very unlikely.

So, that a child should be suffocated in bed by its mother might happen once, but several similar deaths in the same family could not reasonably be accounted for as accidents.

So, in the case of embezzlement effected by means of false entries, a single false entry might be accidentally made; but the probability of accident would diminish at least as fast as the instances increased."

We think the jury could properly conclude on this evidence that the only hypothesis of innocence, accidental causation, was effectively eliminated beyond a reasonable doubt as being irrational and unreasonable. There was left then as the only hypothesis consistent with and explanatory of the

known facts the conclusion that these injuries were caused by the application of unlawful force by some person on several different occasions.

In determining whether or not the respondent was the person whose unlawful acts caused the death of this child, the jury had before it evidence of the relationship between the respondent and her adopted child. Admittedly she assumed all the care of the child and was its constant companion. She was in the best position to know and observe whether it had apparently received severe injury at any time. She was alone with the child much of the time and had the best opportunity to commit the acts which necessarily occurred. During her brief absences from the child, it was cared for by her husband or a baby sitter. There was no suggestion by the respondent or elsewhere in the evidence that the child had ever been injured by either of them or by anyone else. No other person had opportunity to do the several acts involved here. Here again circumstantial evidence points to the respondent and no other. Friends of the respondent testified that on their visits to the home she displayed a high degree of maternal love, care and solicitude. The jury could infer and must have believed that these were but outward manifestations, and that only the respondent could know what her conduct was when she and the decedent were alone. The violence of an ungoverned temper is more often displayed in privacy than under the social restraints engendered by the presence of witnesses. The jury may well have concluded that the respondent concealed knowledge of injuries and of episodes in the life of the child which would have thrown light on what actually transpired. Such conduct is itself a link in and may add force to the chain of circumstantial evidence which the jury is entitled to consider in determining the guilt or innocence of the respondent. See *State* v. *Lambert*, 97 Me. 51 at 56.

At the close of the State's case, Mr. Wheeler, a criminal investigator, was asked to state a particular conversation which he had with the respondent during the course of his investigation. Over objection, he testified that he asked her whether or not anyone else could be responsible for any of the injuries which the child had received and whether or not it could be a baby sitter or her husband, to which she replied that "if anybody would be responsible, it would be me." The exception taken to the admission of this testimony is the only one preserved for our consideration. Objection was on the usual ground that evidence of an admission of guilt by the respondent must await proof of the *corpus delicti* to a probability. It may be noted that the statement attributed to the respondent was not in terms an admission of guilt. Its evidentiary effect was primarily to eliminate as suspect the only other people who had opportunity to injure the child. Obviously the respondent was in the best position to observe and know whether the baby had apparently suffered any injury at the hands of either her husband or a baby sitter. However that may be, on our view of the evidence which had already been presented by the State, the *corpus delicti* (that the death of this child had resulted from the application of unlawful force and violence by some person) had already been shown, not only to a probability, but beyond a reasonable doubt. The admission, therefore, if such it was, was clearly admissible at this stage of the evidence and the respondent takes nothing by the exception.

The husband of the respondent did not testify and the jury was given no indication that he was not available at the time of trial. Next to the respondent herself, her husband was in the best position to know the day to day condition of the child, its treatment at the hands of the respondent in the privacy of the home, and whether or not there were ever manifestations of serious injury. The jury might have considered that his failure to corroborate her

testimony as to these matters casts further doubt upon the value and credibility of the respondent's statements. (See *State* v. *O'Donnell, supra,* at page 303)

In summation, we are satisfied that there was credible evidence for this jury which, if believed, forged an unbroken chain of circumstances, all plotting to the guilt of this respondent. The evidence and proper and reasonable inferences to be drawn from it would in our opinion justify the jury in the elimination of accidental causation as a reasonable and rational hypothesis, and this beyond any reasonable doubt. No other hypothesis consistent with innocence is conceivable under the circumstances which existed here. The jury is not compelled, in its determination as to whether or not a reasonable doubt exists, to disregard all the probabilities and substitute therefor mere unlikely possibilities. These were questions of fact and it is not for us to usurp the place of the jury in deciding them. As was well stated in *State* v. *Lambert, supra,* at page 52:

"Their conclusions, if warranted by the evidence, are to stand. We have before us only the pages of a printed record, aided somewhat by an inspection of the exhibits which were introduced in evidence at the trial. The jury had before them the living, speaking witnesses. The degree of credence properly to be given to the story of a witness may depend much upon his appearance upon the stand, upon his air of candor and truthfulness, upon his seeming intelligence and honesty, upon his apparent want of bias or interest or prejudice. The want of such characteristics may render testimony of little value. And the appearance of such characteristics, or the want of them, is not always transcribed upon the record of a case. If the story of a witness is seemingly credible and probable, and not inconsistent with other admitted or proven facts, the listener has much better opportunity to judge correctly of its truthfulness than a reader has. From the bare record we might be in grave doubt as to which of two conflicting statements is

true. The jury, seeing the witnesses, might have no reasonable doubt. And it follows that in cases like the one under consideration, as in all others, the jury must be the final arbiters of questions of fact, when the evidence in support of their conclusions, considered in connection with all the other evidence, is of such a character, such a quality and such weight, as to warrant them in believing it."

*Exceptions overruled.*

*Motion denied.*

*Appeal dismissed.*

*Judgment for the State.*