MAINE SUPREME JUDICIAL COURT                Reporter of Decisions
Decision:      2024 ME 37
Docket:        Wal-23-13
Argued:        November 8, 2023
Decided:       May 16, 2024

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.[*]

STATE OF MAINE

v.

JESSICA A. WILLIAMS

MEAD, J.

[¶1]  Jessica A. Williams appeals from a judgment of conviction for depraved indifference murder, 17-A M.R.S. § 201(1)(B) (2024), entered by the trial court (Waldo County, *R. Murray, J.*) following a jury trial.  Williams challenges the admission of evidence related to a prior bad act and testimony and arguments regarding her lack of communication with police officers. Williams further contends that the trial court erred in denying her motion for a judgment of acquittal at the close of the evidence.  Williams finally argues that if none of these issues is individually sufficient to warrant reversal, the cumulative effect of all three is a violation of her due process rights.  We

---

[*] Although Justice Jabar participated in the appeal, he retired before this opinion was certified.

disagree with her contentions and affirm the judgment.

## I. FACTUAL BACKGROUND

[¶2] "Viewing the evidence in the light most favorable to the State, the jury could have rationally found the following facts beyond a reasonable doubt." *State v. Plummer*, 2020 ME 106, ¶ 2, 238 A.3d 241.

[¶3] The victim, Maddox Williams, was born to Jessica Williams and Maddox's father on January 9, 2018. Initially Maddox lived with Williams, then he lived with his father and paternal grandmother from March 23, 2018, until February 12, 2020, when his father was arrested and Maddox returned to living with Williams.

[¶4] In October 2020, Williams and Maddox's father began sharing custody of Maddox, each having Maddox on alternating weeks, but by December 2020 Williams was preventing Maddox from visiting with his father. Between October and December 2020, Maddox would occasionally have bruises on his body, primarily on his face or forehead, when he came from Williams's care.

[¶5] Maddox's father brought the custody matter to court, and as a result, his visits with Maddox recommenced February 26, 2021. When Maddox resumed visitation with his father in February 2021, his father and his paternal

grandmother noticed that Maddox had a faded bruise on his forehead. On March 7, 2021, Maddox's father was arrested for reasons unrelated to this matter and Williams assumed what amounted to sole custody of Maddox. At that time, Williams was living with her boyfriend, along with their three other children.

[¶6]  When Williams took sole custody of Maddox, Maddox was not missing any teeth and did not have any visible bruises. Although Maddox was not particularly clumsy before returning to live with Williams, while he was in her custody Williams messaged multiple acquaintances about instances where Maddox had been injured due to his clumsiness, which she said had caused visible bruises.

[¶7]  In the Spring of 2021, Williams, her boyfriend, and their children went on a trip to New Hampshire. At some point on the trip Maddox was thrown out of a bathroom by Williams and landed on a hard, non-carpeted floor. Maddox had skinned knees and elbows, a scratch on his face, and a bruise on his forehead when he returned from New Hampshire.

[¶8]  While living with Williams, Maddox sometimes had bruises on his legs, arms, and forehead, which Williams would cover with make-up and temporary tattoos. Williams would slap and hit Maddox in the mouth and tell

him to turn away from her, saying that she did not want to look at his "ugly face" because it reminded her of his father. Williams and her boyfriend called Maddox offensive names. Williams's other children were rough with each other and with Maddox. Williams was aware that her other children hit Maddox but did nothing to prevent it. Maddox occasionally played on a trampoline at Williams's house under her boyfriend's supervision.

[¶9]  In May or June 2021, Williams's mother, Sherry Johnson, noticed that Maddox had lost a front tooth while living with Williams. When she asked Williams about it, Williams explained that Maddox had fallen over and knocked the tooth out. Sometime after noticing Maddox's first missing tooth, Johnson noticed that Maddox was missing another tooth, which Williams explained as having been knocked out when Maddox fell again.

[¶10]  Williams called Johnson on June 20, 2021, and told her that Maddox did not feel well and that she thought he should be taken to the hospital, but that she would like Johnson's opinion. When Johnson arrived at Williams's house about ten minutes after the call, she saw that Maddox was pale and gray; the three went to the hospital. As they arrived at the hospital, Maddox lost consciousness. Arriving at the emergency room at about 1 p.m., Williams informed ER staff that Maddox had been caught in her puppy's leash and been

dragged by the puppy, hitting a boulder, after which his sister had kicked him in the belly.  The puppy in question weighed fifteen pounds.

[¶11]   ER staff and police made the following observations about Maddox:

- His head was misshapen.

- He had a very large bruise and bump on his forehead.

- He had a temporary tattoo on his forehead as well as on other parts of his body.

- He had numerous bruises at various stages of healing all over his body.

- He had a grayish clear liquid coming out of a nostril and an ear.

- His neck and central joints were floppy, but his extremities were stiff.

- He appeared pale and thin, and his stomach was distended.

[¶12]  At some point, Maddox's heart stopped beating and, although ER staff attempted to resuscitate Maddox for about an hour, he was pronounced dead at the hospital.  Williams did not appear to react strongly to Maddox's death, and Williams and Johnson left the ER shortly after his death.

[¶13]  At around this time, an informant told the police that Williams's boyfriend had texted him that Williams had been abusing her son and that the son was on the way to the hospital.

[¶14]  While still in the hospital parking lot, Williams received a call from the police on her cellphone; Johnson answered it, and police informed her that they would like her to keep Williams in the parking lot so that they could interview her.  When Johnson relayed this information, Williams said that she was not ready to speak to anyone yet and immediately drove away from the hospital.  Williams drove the two of them back to Johnson's house and stayed there while Johnson went to Williams's house.  Williams asked Johnson to lie to police and say that she had dropped Williams off at the pier in Searsport, and Johnson told this to police at Williams's house.  Williams's boyfriend told police that Maddox and the other kids had been outside alone when Maddox was injured.  Police were dispatched shortly after Maddox's death to locate Williams, but they were unable to find her.

[¶15]  While the police were looking for her, Williams was contacting friends from phone numbers that were not her own.  Williams appeared to be hiding from police and, for example, informed one of her friends that "[t]he cops are trying to charge me . . . and I need a place to hide out, saying I killed [Maddox]," and "police [are] at my house, DHHS, everyone.  I'm not going home to deal with that . . . . Keep this between us, please."  Williams and her boyfriend both created alternate email accounts and phone numbers, under pseudonyms,

from which they could text and call. Williams also did not use her phone or debit and credit cards because she knew that they could be used to track her. On June 21, a friend of Williams picked her up from Johnson's house and drove her to the house of one of Williams's other friends.

[¶16] Late on June 22 or early on June 23, Williams returned to Johnson's house. In a conversation with police on June 23, Johnson revealed that Williams was in Johnson's house and allowed police inside to interview Williams. Williams told police the following:

- Maddox had fallen off the trampoline the week prior.

- She believed that the puppy had caused Maddox's injuries.

- Maddox had been complaining that his stomach hurt.

- Maddox had had no injuries in the days preceding his death.

- Maddox was missing two teeth after returning from a stay with his father, and she noticed a third missing tooth in the hospital.

- She never put her hands on her children.

- She was missing $1,600 in cash, which she claimed she had lost.

- She did not expect anything in her house to test positive for Maddox's blood.

[¶17] After interviewing Williams, police arrested her and found $1,600 in cash on her person.

[¶18] Upon searching Williams's house, the police found several stained items that tested presumptively positive for blood and were submitted to the crime lab. When tested, these items contained DNA that matched a profile taken from Maddox.

[¶19] The autopsy of Maddox's body found the following:

- Multiple contusions and abrasions on his head and body, and a laceration of his ear.

- Injuries covered with temporary tattoos.

- Lacerations of the mouth consistent with blunt-force injury to the lips.

- Three missing teeth, with one tooth's socket fractured.

- Hemorrhages in his skull.

- Hemorrhages and lacerations in the abdomen and internal organs.

- The transection of his pancreas.

- Fractures in two vertebrae of his spine.

[¶20] The medical examiner drew the following conclusions:

- The internal organ injuries were recent, having occurred just hours before his death, and they had led directly to Maddox's death.

- The internal organ injuries were not consistent with injuries sustained while playing or jumping on a trampoline, but rather with a more violent event, like a car crash or fall from a great height.

- The internal organ injuries could not have been caused by a child's kick or adult's punch, but a stomp from an adult could have caused them.

- One tooth had been lost within a day of Maddox's death, and the other two less recently. This loss of teeth was not consistent with normal loss of baby teeth, which usually occurs several years later in a child's development, but instead was consistent with blunt-force trauma.

[¶21] The medical examiner's opinion was that Maddox's death was a result of battered child syndrome with recent and old blunt-force injuries, and that the injuries were consistent with non-accidental trauma. The medical examiner further opined that the potential reasons for Maddox's injuries given by Williams at the hospital could not have produced those injuries.

## II. PROCEDURAL HISTORY

[¶22] On June 24, 2021, the State charged Williams by criminal complaint with depraved indifference murder, 17-A M.R.S. § 201(1)(B), and on July 26, 2021, a grand jury indicted Williams for that charge. After Williams entered a plea of not guilty on October 21, 2021, the court held a six-day jury trial in October 2022.

[¶23] During the first day of the trial, the court heard argument on the State's motion in limine seeking to introduce evidence of prior bad acts. The State sought to offer testimony concerning the incident in New Hampshire where Williams had thrown Maddox out of a bathroom. Over Williams's objection, the court granted the motion, but it indicated that the testimony

would need to be accompanied by a limiting instruction. The court specifically found that the evidence was admissible under M.R. Evid. 403 and 404 for the purpose of demonstrating the relationship between Williams and Maddox and that the probative value of the evidence was not substantially outweighed by its prejudicial effect. The court stated that the limiting instruction would "instruct the jury . . . that evidence of a prior bad act is generally not admissible for the purpose of allowing . . . the jury, to infer that the defendant acted in conformity with that prior bad act or even had a propensity to act in conformity with that prior bad act" and that the evidence "may be considered" by the jurors if they "find it persuasive as to the relationship between the defendant and the alleged victim at the time of the incident testified about."

[¶24] Immediately before the testimony was presented to the jury, Williams requested that the instruction be given, at which point the court instructed the jury:

> [G]enerally evidence about some prior bad act by the defendant is not admissible for the purposes of allowing you to make an inference that the defendant acted in conformity with that prior bad act, or even had a propensity to act in conformity with that prior bad act. That's—that would be improper for you to make that kind of an [inference]. This evidence as it's going to be described to you, however, from this witness, may be considered by you, if you find it persuasive, as to the relationship between the defendant and the alleged victim at the time of this incident. Again, for the relationship, not that it's an inference that the defendant acted in

conformity with that prior action sometime in the future. That's the purpose for which you can accept that evidence.

[¶25] During the trial, the State repeatedly elicited testimony establishing, and in closing made reference to, the fact that Williams appeared to have fled from the police. Williams did not object to this testimony or address it in her argument at trial, nor did the court address it.

[¶26] At the close of the evidence, Williams moved for a judgment of acquittal. The court denied the motion, ruling:

> Again the Court at this stage, which it must, takes the evidence in the light most favorable to the State. There has been presented evidence through various witnesses as well as experts regarding the cause of death being a battered child syndrome diagnosis with regard to a non-accidental force that resulted in death of this particular [victim]. The inferences that can be drawn from the testimony with respect to the defendant could lead this Court to conclude beyond a reasonable doubt that she was the cause of that infliction of the death-producing incident. And given that, as well as the numerous other incidents of injury demonstrated to the defendant—excuse me, to the victim, any jury could also conclude beyond a reasonable doubt that they represented depraved indifference necessary to support a charge before the Court. Accordingly the motion is denied.

The jury subsequently returned a verdict of guilty. On December 20, 2022, Williams was sentenced to the Department of Corrections for a term of forty-seven years. Williams timely appealed to this Court. M.R. App. P. 2B(b)(1); 15 M.R.S. § 2115 (2024).

## III. DISCUSSION

[¶27] On appeal, Williams argues that the trial court erred in (1) admitting evidence related to a prior bad act, (2) admitting evidence regarding her lack of communication with police officers, and (3) denying her motion for a judgment of acquittal made after the close of the evidence. Williams also argues that if none of these errors sufficiently warrant reversal on their own, the cumulative effect of all three constitutes a violation of her due process rights. We review Williams's four arguments in that order.

## A. The Trial Court's Admission of Evidence of a Prior Bad Act

[¶28] Williams first argues that the trial court erred by admitting evidence concerning her having thrown Maddox out of a bathroom during a trip to New Hampshire. "[W]e review [a] trial court's decision to admit . . . evidence pursuant to Rule 404(b) for clear error and its determination pursuant to Rule 403 for an abuse of discretion." *Steadman v. Pagels*, 2015 ME 122, ¶ 18, 125 A.3d 713 (quotation marks omitted).

### 1. Rule 404(b)

[¶29] Maine Rule of Evidence 404(b) provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the

character." However, "evidence of prior bad acts is admissible for limited purposes other than to prove propensity," including, inter alia, "identity" and "the relationship of the parties." *State v. Pratt*, 2015 ME 167, ¶¶ 24-25, 130 A.3d 381 (quotation marks omitted).

[¶30]  The State offered evidence of Williams's having thrown Maddox onto a hard floor to illustrate her attitude toward him and her willingness to use violence against him, both of which were relevant to the identity and motive of the person who inflicted the injuries that caused Maddox's death, as well as to the credibility of her explanation for the injuries. We have traditionally permitted the admission of evidence for such a purpose in cases of assault or abuse of a child. *See Pratt*, 2015 ME 167, ¶ 24, 130 A.3d 381; *State v. Allen*, 2006 ME 20, ¶ 19, 892 A.2d 447. In *Pratt*, we held that evidence that the defendant had assaulted the victim fifteen hours before the victim was killed "was relevant, and therefore admissible, concerning . . . identity . . . and the relationship of the parties." 2015 ME 167, ¶ 25, 130 A.3d 381. In another similar case, we concluded that evidence that a father had spanked his son the day before the son was killed was admissible as "relevant and probative to negate pretrial statements made by [the defendant] that [the victim's] injuries may have been the result of falls [the victim] suffered." *Allen*, 2006 ME 20, ¶ 19,

14

892 A.2d 447. In *Allen* we held that the evidence "was also relevant to show that [the defendant] did not object to the spanking and that she was complicit in physically disciplining [the victim]" and was "relevant and probative of the relationship between [the defendant] and [the victim]." *Id.* The evidence in this case was admitted for similar purposes and was probative as to similar issues. Thus, its admission under Rule 404 was not clear error.

### 2. Rule 403

[¶31] Rule 403 provides that a "court may exclude evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." In some circumstances, a court may also alleviate the prejudice of probative evidence that is admitted by giving a limiting instruction to the jury. *See Allen*, 2006 ME 20, ¶ 20, 892 A.2d 447 (holding that a limiting instruction can help to alleviate prejudice); *State v. Hunt*, 2023 ME 26, ¶ 30, 293 A.3d 423 ("A jury is presumed to follow the court's instructions.").

[¶32] Although the evidence establishing that Williams threw Maddox was prejudicial to her because it provided evidence of her prior violence toward Maddox, the trial court limited any unfair prejudicial effect by providing a limiting instruction informing the jury that the evidence could not be used to infer that Williams had acted in conformity with that prior bad act.

Furthermore, as discussed above, the evidence was highly relevant and probative to a central issue at trial. *See, e.g.*, *Pratt*, 2015 ME 167, ¶ 26, 130 A.3d 381. Therefore, the court did not abuse its discretion in determining that the evidence was not unfairly prejudicial and did not err in declining to exclude the evidence under Rule 403.

## B. The Admission of Evidence About Williams's Silence

[¶33] Williams's second argument is that the State improperly elicited evidence and made arguments in closing regarding her lack of communication with police in the days immediately following Maddox's death. Williams concedes that she did not raise this issue at trial.

[¶34] Because Williams did not raise the issue at trial, the trial court did not have an opportunity to address it, and, accordingly, our review is for obvious error. *See State v. Reeves*, 2022 ME 10, ¶ 35, 268 A.3d 281. To vacate a conviction based on obvious error, there must be (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness and integrity of judicial proceedings. *See State v. Bilynsky*, 2021 ME 56, ¶ 4, 263 A.3d 163. An error is plain if it is "so clear under current law that the trial judge and prosecutor were derelict in countenancing it." *Reeves*, 2022 ME 10, ¶ 37, 268 A.3d 281 (quotation marks and alteration omitted).

[¶35]  Although in most cases the State cannot rely on a defendant's silence as evidence of guilt, "[*n*]ontestimonial actions such as flight, hiding, or resisting arrest may be admissible as evidence of consciousness of guilt." *State v. Lovejoy*, 2014 ME 48, ¶ 20 n.6, 89 A.3d 1066 (citing *Doe v. United States*, 487 U.S. 201, 207 (1988); *United States v. Francois*, 715 F.3d 21, 32 (1st Cir. 2013); *State v. Hassan*, 2013 ME 98, ¶¶ 20-27, 82 A.3d 86).  Indeed, we have explicitly held that "[e]vidence of flight permits the jury to infer a consciousness of guilt or that the defendant was motivated by a desire to avoid prosecution for the underlying charges." *State v. Haji-Hassan*, 2018 ME 42, ¶ 27, 182 A.3d 145 (quotation marks and alteration omitted); *see also State v. Barnes*, 2004 ME 38, ¶ 5, 845 A.2d 575 ("[E]vidence of flight, concealment, or analogous conduct is probative to establish a consciousness of guilt." (quotation marks omitted)).

[¶36]  Williams's argument accordingly fails on the first prong of the obvious error test—there was no error.  Williams characterizes the State's references to her lack of communication with the police as a comment on her invocation of her constitutional right to silence, but this is a mischaracterization of the focus of the State's evidence.  The evidence elicited by the State at trial was not a comment on Williams's silence, but rather concerned what the jury

could rationally have found to be Williams's attempts to flee from and evade police. The State's closing argument also focused on Williams's flight and not her silence, as the State argued that Williams "fled the emergency room"; "concocted" a story; "hid out . . . to avoid detection"; and "was trying to hide from the police to avoid arrest." The admission of the evidence concerning Williams's flight was not obvious error.

## C. The Trial Court's Denial of Williams's Motion for a Judgment of Acquittal

[¶37] Third, Williams argues that there was insufficient evidence that she had caused Maddox's injuries, and that therefore the trial court's denial of her motion for a judgment of acquittal was error. "We review the denial of a motion for judgment of acquittal by viewing the evidence in the light most favorable to the State to determine whether a jury could rationally have found each element of the crime proven beyond a reasonable doubt." *State v. Abdullahi*, 2023 ME 41, ¶ 41, 298 A.3d 815 (quotation marks omitted).

[¶38] "A person is guilty of murder if the person . . . [e]ngages in conduct that manifests a depraved indifference to the value of human life and that in fact causes the death of another human being." 17-A M.R.S. § 201(1)(B). Furthermore, "when causing a result is an element of a crime, causation may be found when the result would not have occurred but for the conduct of the

defendant, operating either alone or concurrently with another cause." 17-A M.R.S. § 33(1) (2024).

[¶39]  Williams's argument is largely focused on the fact that there is no direct evidence that she inflicted the injuries that led to Maddox's death. However, we have long held that a lack of direct evidence is not fatal to the prosecution, because "[c]ircumstantial evidence alone is sufficient to support a conviction as long as the evidence as a whole supports each element of the crime."  *State v. Brown*, 2017 ME 59, ¶ 9, 158 A.2d 501 (quotation marks omitted); *State v. Cheney*, 2012 ME 119, ¶ 42, 55 A.3d 473; *see also State v. Moores*, 2009 ME 102, ¶ 10, 982 A.2d 318; *State v. Stinson*, 2000 ME 87, ¶ 8, 751 A.2d 1011 ("Circumstantial evidence is not, as a matter of law, inherently inferior evidence; factual findings may be supported by reasonable inferences drawn from all the circumstances *even if those inferences are contradicted by parts of the direct evidence.*" (emphasis added)); *State v. Ardolino*, 1997 ME 141, ¶ 20, 697 A.2d 73 ("A conviction may be grounded on circumstantial evidence and is not for that reason less conclusive."); *State v. LeClair*, 425 A.2d 182, 184 (Me. 1981); *State v. Liberty*, 280 A.2d 805, 807 (Me. 1971); *State v. Allen*, 151 Me. 486, 489, 121 A.2d 342, 345 (1956) ("[A]ny crime may be proven by circumstantial evidence."); *State v. Ward*, 119 Me. 482,

494, 111 A. 805, 809 (1921); *State v. Benner*, 64 Me. 267, 289 (1874) ("Crime is ordinarily proved by circumstantial evidence."); *State v. Knight*, 43 Me. 11, 141-43 (1857) (holding that "[c]ircumstantial evidence is composed of facts equally with that which is denominated direct" and affirming a jury instruction that stated that if "the circumstances are all consistent with [the defendant's] guilt, if they conclusively tend to prove his guilt, and are of a character to exclude all reasonable doubt that the crime could have been committed by any other person, . . . the government . . . have done all that they were required to do, and are entitled to a verdict" (quotation marks omitted)). In assessing circumstantial evidence, "[a] factfinder may draw all reasonable inferences from the circumstantial evidence." *State v. Woodard*, 2013 ME 36, ¶ 23, 68 A.3d 1250 (quotation marks omitted).

[¶40] When viewed in the light most favorable to the State, the jury could have rationally found the following facts beyond a reasonable doubt: Maddox was killed by the internal organ injuries that he sustained just hours prior to his death. The force that was required to cause his injuries could not have resulted from the accidental causes Williams offered in her explanation at the hospital. The injuries were not accidental and were a result of battered child syndrome. Williams had previously injured Maddox, permitted her children to

injure Maddox, and attempted to conceal the injuries that Maddox suffered in her care. Williams would verbally abuse Maddox because he reminded her of his father. Williams and her boyfriend would call Maddox offensive names. The injuries to Maddox's mouth were consistent with Williams hitting Maddox in the mouth. Williams's statement to police that she noticed that Maddox was missing teeth after returning from a stay with his father was controverted by evidence to the contrary, including a picture showing him not missing any teeth after the date she claimed to have noticed missing teeth, as well as by Williams's own explanations to Johnson. There was no evidence that Williams's boyfriend hit Maddox.

[¶41] In light of these facts, the jury could have rationally found beyond a reasonable doubt that Williams's conduct caused the non-accidental injuries to Maddox's internal organs that directly led to his death. *See, e.g., Ardolino*, 1997 ME 141, ¶ 21, 697 A.2d 73 ("[T]he jury properly could have found that the circumstances, viewed in relation to each other and together with the rational inferences that could be d[r]awn from them, satisfied the State's burden of proof that every element of the charged offense had been proven beyond a reasonable doubt."). The evidence of Williams's constant physical and verbal

abuse of Maddox[1] for no reason other than that he was the son of her former partner could have permitted a jury to rationally find beyond a reasonable doubt that the conduct that led to Maddox's death manifested Williams's depraved indifference to the value of Maddox's life.

[¶42]  The facts surrounding cases of assault or abuse of a child by an adult often present similar records, where there is little direct evidence and the State's case must be built on circumstantial evidence.  For example, in *Ardolino*, we considered a record that did not contain direct evidence of the injury that caused the death of a battered child victim but supported a circumstantial inference that the defendant had caused the injury that led to the victim's death. *Id*. ¶¶ 2, 19-21.  There, we ultimately concluded that the lack of direct evidence did not prevent the trial court from denying the defendant's motion for a judgment of acquittal.  *Id*. ¶ 21.

[¶43]  Moreover, the law in *Ardolino* was not new, as even before the adoption of the Maine Rules of Evidence in 1976, we held the same way in a similar case.  *See State v. Silva*, 153 Me. 89, 134 A.2d 628 (1957); *see also* M.R. Evid., Me. Rptr., 336-343 A.2d XL-LXXVIII (promulgating the Maine Rules of

---

[1]  It is worth noting there was no issue raised regarding the evidence of Williams's prior abuse of Maddox with the exception of the New Hampshire bathroom incident.

22

Evidence); *State v. Williams*, 388 A.2d 500, 506 (Me. 1978) (Nichols, J., concurring) ("[I]n 1976 the Maine Rules of Evidence, modeled after the Federal Rules of Evidence, were promulgated."). In *Silva*, a mother brought her child, who was in a state of shock and suffering trauma to his head, to a doctor. 153 Me. at 90-91, 134 A.2d at 629. The child's mother explained that the child had suffered an accidental fall and she had been the only person present at the time of the accident. *Id*. at 91-92, 134 A.2d at 629. The child subsequently died and an autopsy revealed that the child had had "an almost unparalleled succession of traumatic experiences" over the course of his short life. *Id*. at 91-93, 134 A.2d at 629-30. Although there was no direct evidence that the child's mother had inflicted the fatal trauma, we said:

> In determining whether or not the respondent was the person whose unlawful acts caused the death of this child, the jury had before it evidence of the relationship between the respondent and her adopted child. Admittedly she assumed all the care of the child and was its constant companion. She was in the best position to know and observe whether it had apparently received severe injury at any time. She was alone with the child much of the time and had the best opportunity to commit the acts which necessarily occurred. During her brief absences from the child, it was cared for by her husband or a baby sitter. There was no suggestion by the respondent or elsewhere in the evidence that the child had ever been injured by either of them or by anyone else.

*Id*. at 100, 134 A.2d at 633-34. We then held that "the chain of circumstantial evidence which the jury is entitled to consider" could, "if believed, forge[] an

unbroken chain of circumstances, all pointing to the guilt of this respondent," and affirmed the trial court's denial of the defendant's motion for a new trial. *Id*. at 100, 102, 134 A.2d at 634.

[¶44] In light of our longstanding rule that circumstantial evidence alone may support a conviction, and noting that circumstantial evidence is often, unavoidably, the only evidence the State can present in cases of abuse of a very young child by a parent or other adult, we conclude that there was no error in the trial court's denial of Williams's motion for a judgment of acquittal.

## D.    Cumulative Error

[¶45] Williams's fourth and final argument is that if none of her three other arguments alone justifies vacating her conviction, then collectively they should under the "cumulative-error doctrine." We have yet to clearly define the parameters of a test for the cumulative-error doctrine, and instead review allegations of multiple errors "cumulatively and in context to determine whether the defendant received an unfair trial that deprived him or her of due process." *State v. Daluz*, 2016 ME 102, ¶¶ 52, 67-69, 143 A.3d 800 (quotation marks and alterations omitted); *Hassan*, 2013 ME 98, ¶¶ 37-62, 82 A.3d 86 (Jabar, J., dissenting) (noting that the Law Court has "not . . . adopted the federal cumulative error analysis"); *State v. Dolloff*, 2012 ME 130, ¶¶ 74-76,

58 A.3d 1032.

[¶46]  In any event, because Williams's three other arguments on appeal fail, her cumulative-error argument cannot succeed.

The entry is:

Judgment affirmed.

---

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Jessica A. Williams

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Waldo County Unified Criminal Docket docket number CR-2021-424
FOR CLERK REFERENCE ONLY