MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2026 ME 8
Docket:        And-24-541
Argued:        September 10, 2025
Decided:       February 5, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.


STATE OF MAINE

v.

AARON ALDRICH


LIPEZ, J.

[¶1]  Aaron Aldrich appeals from a judgment of conviction of two counts of intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2025), and possession of a firearm by a prohibited person (Class C), 15 M.R.S. § 393(1)(A-1)(1) (2022),[1] entered by the trial court (Androscoggin County, *Archer, J.*) after a jury trial.  Aldrich challenges the court's denial of his motion to suppress his post-arrest statements.  He also asserts that a multitude of erroneous evidentiary rulings infected his trial from start to finish and that these errors, even if not individually sufficient to require reversal, cumulatively deprived him of a fair trial.  Lastly, he contends that the court improperly

---

[1]  As a result of recent amendments to 15 M.R.S. § 393(1)(A-1), the version of possession of a firearm by a prohibited person charged in this case is now a Class B crime.  *See* P.L. 2023, ch. 491, § 1 (effective Aug. 9, 2024) (codified at 15 M.R.S. § 393(1)(A-1) (2025)).

2

instructed the jury. Upon review of each of Aldrich's claims, we conclude that they either lack merit or, in instances where we do find error, that the errors—even when viewed together—do not warrant reversal. Aldrich also appeals from the court's imposition of concurrent life sentences for the murder convictions. *See State v. Aldrich*, No. SRP-24-540 (Me. Sent. Rev. Panel Feb. 20, 2025). We conclude that the court did not misapply legal principles or otherwise err in imposing the sentences. We therefore affirm the judgment.

## I. BACKGROUND

### A. Facts

[¶2] We begin with an overview of the pertinent facts, reserving further detail for our discussion of each of Aldrich's arguments. Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Lester*, 2025 ME 21, ¶ 2, 331 A.3d 426.

[¶3] On the evening of February 20, 2023, Aldrich, who had plans to "do a job," obtained a ride from a friend to a trailer in Poland. Aldrich knew the residents of the trailer—one adult and one teenager—because he had been there two days prior to sell a generator to the adult. The adult resident was known to keep illegal drugs and large amounts of cash on hand.

[¶4]  Aldrich was carrying a tool bag with a nine-millimeter rifle inside when he arrived at the trailer around 10 p.m. on February 20.  While Aldrich's friend waited outside, Aldrich entered the trailer, where he encountered the teenager sitting in a chair in the living room.  Aldrich shot the teenager multiple times.  He then proceeded down a hallway to the bedroom, where he found the adult resident.  Aldrich struck the adult in the face with the rifle and then shot him, too, multiple times.  On his way out the door, Aldrich took a handgun and cash from the trailer.

[¶5]  As they drove away from the scene, Aldrich told his friend that he had "flanked" or "flogged" them, which the friend understood to mean that Aldrich had killed the people in the trailer.  Aldrich met up with his girlfriend shortly thereafter; he directed her to dispose of the tool bag and warned her that if she did not comply, he would harm her daughter.  Inside the tool bag, which the girlfriend hid in a garage, were two pairs of the adult victim's pants, an empty nine-millimeter magazine, the nine-millimeter rifle, and Aldrich's jeans and sneakers.  The rifle, jeans, and sneakers were splattered with the adult victim's blood.

[¶6]  A friend of the adult victim reported the shooting to the police the next morning.  The officers who responded to the trailer confirmed that the two

4

victims were deceased. During a subsequent search of the trailer, Maine State Police detectives found nine-millimeter bullet casings in the living room near the teenage victim's body and in the bedroom near the adult victim's body. Ballistics testing confirmed that the casings were fired from the nine-millimeter rifle later recovered from the tool bag.

[¶7] On February 24, Maine State Police detectives, who had received information that Aldrich was involved in the Poland deaths, tracked his cell phone to a shopping mall in Salem, New Hampshire. The detectives sought assistance from the New Hampshire State Police, informing them that in addition to being a murder suspect, Aldrich had arrest warrants that subjected him to extradition and had stolen a van from a parking lot in Brunswick on February 22. When the New Hampshire officers found Aldrich and the stolen van on the second floor of the mall's parking garage, Aldrich fled on foot, discarding along the way a large-capacity magazine and the handgun he had stolen from the trailer. He was quickly caught and taken into custody.

[¶8] The stolen van was returned to Maine and searched pursuant to a warrant. Inside, the Maine State Police discovered three additional nine-millimeter magazines and a large quantity of nine-millimeter ammunition.

**B.     Procedure**

[¶9]  On February 27, 2023, the State charged Aldrich by complaint with two counts of intentional or knowing murder.  On April 4, a grand jury returned an indictment charging him with two counts of murder and one count of possession of a firearm by a prohibited person.

[¶10]   In May 2024, Aldrich filed a motion to suppress post-arrest statements that he had made to law enforcement on the basis that he was interrogated without being read his *Miranda*[2] rights and after he had invoked his right to counsel.[3]  After holding an evidentiary hearing, the court denied the motion in a written order.

[¶11]  In the run-up to trial, the court addressed several other pretrial motions, the relevant details of which we discuss below.  The trial, which lasted seven days, required the court to resolve a panoply of evidentiary disputes.  We also defer recitation of the specific details of these disputes to our subsequent legal analysis.

[¶12]   Aldrich testified in his own defense, claiming that the teenage victim threatened him in the days prior to the shootings, that he returned on

---

[2]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]  In July 2024, Aldrich filed a supplement to the initial motion to suppress.

6

the night in question (unarmed) to sell drugs to the adult victim, and that he shot both victims in self-defense with his girlfriend's rifle, which, for reasons unknown to Aldrich, happened to be at the victims' trailer.

[¶13]  Following the close of the evidence, the court instructed the jury, over Aldrich's objection, that it could consider Aldrich's flight after the shootings as evidence of his consciousness of guilt.  The court also denied Aldrich's request for an instruction on the defense of "necessity," but granted his request for a self-defense instruction.

[¶14]  The jury found Aldrich guilty of all charges.  On November 22, 2024, the court sentenced Aldrich to concurrent terms of life in prison on each of the murder counts and a concurrent sentence of five years' imprisonment on the firearm-possession count.[4]

[¶15]  Aldrich filed a timely notice of appeal and an application to allow an appeal of his sentence.  *See* 15 M.R.S. §§ 2115, 2151 (2025); M.R. App. P. 2B(b)(1), 20.  The Sentence Review Panel granted the application, and the sentence appeal was automatically merged into the direct appeal, *see* M.R. App. P. 20(g)-(h).

---

[4]  The court also ordered Aldrich to pay a fine and $6,795 in restitution to reimburse the Victims' Compensation Fund.

## II. DISCUSSION

[¶16]  On appeal, Aldrich argues that the trial court erred in (1) denying his motion to suppress; (2) admitting a plethora of irrelevant and unfairly prejudicial evidence offered by the State while simultaneously excluding admissible evidence offered by Aldrich; (3) instructing the jury; and (4) conducting the sentencing analysis.  We address each contention in turn.

### A.    Denial of Motion to Suppress

[¶17]  Aldrich asserts that the court erroneously denied his motion to suppress his post-arrest statements because the statements were elicited in violation of *Miranda v. Arizona*, 384 U.S. 436, 467-70 (1966).[5]  He does not dispute the suppression court's factual findings, and we therefore review the court's denial of his motion to suppress de novo.  *See State v. Akers*, 2021 ME 43, ¶ 23, 259 A.3d 127.

[¶18]  The court found the following facts, "which are supported by competent evidence from the suppression record."  *State v. Hernandez-Rodriguez*, 2025 ME 9, ¶ 3, 331 A.3d 354.  The New Hampshire officers who arrested Aldrich brought him to a police barracks where two Maine State Police detectives were waiting to speak with him.  The detectives

---

[5]  Aldrich raises this claim pursuant to only the United States Constitution.  *See State v. Hernandez-Rodriguez*, 2025 ME 9, n.5, 331 A.3d 354.

8

and Aldrich met in a small room for less than ten minutes. One of the detectives told Aldrich that he was working on something in Maine and asked if Aldrich was willing to discuss his whereabouts on a particular day and time. Aldrich responded, "Half the time, I don't know, like, dates and times," and the detective replied that they did not expect him to know "to a T" where he was but would be looking for a "ballpark."

[¶19] The detective informed Aldrich that he could decide whether he wished to speak with the officers and that if he did, they would first read him his rights. The detective also explained that if Aldrich agreed to an interview, he could decide to answer only some questions and could end the conversation at any time. Aldrich replied, "It depends on what it's about because usually I don't even talk until I talk to my lawyer. I don't even know what this is about." Aldrich continued, stating, "I got nothing to say until I find out what I'm being, what this is about and until I talk to my lawyer."

[¶20] After the detective responded that they were investigating a homicide in Maine and were talking to a lot of people, Aldrich stated, "Somebody said that to me recently and I'm like, are you f*****g serious? Like, dude I'm a freaking thief, bro, I'm not . . . I'm an ice dealer, I'm not . . . ." The detective reiterated that Aldrich needed to tell him what he wanted to do, and

Aldrich responded, "I'm good, like I'll wait until I talk to a lawyer then . . . I haven't killed anybody, I know that." The detective then explained that Aldrich would be extradited to Maine and ended the interaction.

[¶21] Aldrich argues on appeal that evidence of his statement that he had not killed anyone[6] should have been suppressed because he made the statement without having been advised of his *Miranda* rights. "A person who is in custody and subject to interrogation must be advised of the rights referred to in *Miranda v. Arizona* in order for statements made during the interrogation to be admissible against [him] as part of the State's direct case at trial." *State v. Bridges*, 2003 ME 103, ¶ 23, 829 A.2d 247. There is no dispute that Aldrich was in custody when the detectives spoke with him; the only issue is whether the police comments that preceded Aldrich's statements constituted "interrogation" under *Miranda*. We have explained that "[s]tatements are the product of interrogation if the police engaged in express questioning or uttered any word or actions that the police should know are reasonably likely to elicit an incriminating response from the suspect. The test is objective." *Hernandez-Rodriguez*, 2025 ME 9, ¶ 20, 331 A.3d 354 (alteration, citation, and quotation marks omitted).

---

[6] The only statement introduced at trial was Aldrich's assertion to the detective, "I haven't killed anybody, I know that."

[¶22]  We conclude that the suppression court correctly determined that the detective's comments did not constitute interrogation.  The detective's "announcement of an intent to question was not the functional equivalent of interrogation."  *State v. Rizzo*, 1997 ME 215, ¶ 13, 704 A.2d 339 (affirming a conclusion of no interrogation where an officer told the defendant "that he would be asking him some questions, without initiating any further discussion with" the defendant).  Further, the reply to Aldrich that the detectives were investigating a homicide was not interrogation because it was neither express questioning nor reasonably likely to elicit an incriminating response.  *See Hernandez-Rodriguez*, 2025 ME 9, ¶ 20, 331 A.3d 354; *State v. Reese*, 2010 ME 30, ¶¶ 5-6, 991 A.2d 806.  Because the trial court did not err in determining that Aldrich was not subject to custodial interrogation, we do not reach his alternative argument that he was improperly questioned after he invoked his right to an attorney.  *See State v. McNaughton*, 2017 ME 173, ¶ 29, 168 A.3d 807; *Smith v. Illinois*, 469 U.S. 91, 94-95 (1984).

**B.  Evidentiary Rulings**

[¶23]  Aldrich's primary argument on appeal is that the court made several erroneous evidentiary rulings, the cumulative impact of which deprived him of a fair trial.

[¶24]   "[W]e have not explicitly adopted the federal cumulative error analysis," *State v. Hassan*, 2013 ME 98, ¶ 39, 82 A.3d 86 (*Jabar, J.*, dissenting), and "instead review allegations of multiple errors cumulatively and in context to determine whether the defendant received an unfair trial that deprived him or her of due process."  *State v. Williams*, 2024 ME 37, ¶ 45, 315 A.3d 714 (quotation marks omitted).  Aldrich identifies a dozen alleged evidentiary errors.  We divide our analysis into three parts, first addressing those evidentiary rulings in which we perceive no error, then explaining why in three instances we conclude that the trial court did err, and finally, assessing the impact of those errors on Aldrich's right to a fair trial.  *See id.* ¶ 46 (noting that a cumulative-error argument "cannot succeed" absent an error).

### 1.    No Error

#### a.    Admission of Images of the Victims' Bodies

[¶25]   Aldrich contends that the court erroneously admitted unduly prejudicial images of the victims' bodies—in the form of police video footage from the scene of the crime and photographs from the teenage victim's autopsy—in violation of M.R. Evid. 403, which provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  We review a trial court's determination

pursuant to Rule 403 for an abuse of discretion, *Williams*, 2024 ME 37, ¶ 28, 315 A.3d 714, and the court's underlying factual findings for clear error, *State v. Gervais*, 2025 ME 27, ¶ 16, 334 A.3d 645.

[¶26]  "A gruesome photograph of a victim's body may be admitted provided that its probative value outweighs the danger of unfair prejudice.  The critical factor in this balancing test is the significance of the photograph in proving the State's case."  *State v. Lockhart*, 2003 ME 108, ¶ 46, 830 A.2d 433 (citation and quotation marks omitted); *see* M.R. Evid. 403.  "To sustain a Rule 403 objection," the evidence must have an "undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one."  *State v. Allen*, 2006 ME 21, ¶ 13, 892 A.2d 456 (quotation marks omitted).

[¶27]  Here, the court found that neither the video nor the photographs were particularly prejudicial—a finding that was not clearly erroneous.  *See id.* ¶ 14.  And importantly, the evidence was significant to the State's case because it helped to disprove Aldrich's claim of self-defense.  *See State v. Ouellette*, 2012 ME 11, ¶ 17, 37 A.3d 921 (explaining that the State has the burden to disprove a self-defense justification beyond a reasonable doubt). The video footage showed that the position of the teenage victim's body was not

consistent with Aldrich's testimony: instead, the victim was found where Aldrich claimed to be standing when he fired the gun. The autopsy photographs, in turn, showed that Aldrich could not have been as close to the teenage victim as he claimed. As the medical examiner testified, while using the photographs for "illustrat[ive]" purposes, *Lockhart*, 2003 ME 108, ¶ 46, 830 A.2d 433, the absence of soot or stippling on the body meant that the victim was not shot at close range. We thus discern no abuse of discretion in the court's decision to admit the video and photographs. *See id.* ¶¶ 45-46 (finding no error in the admission of gruesome autopsy photographs because they were "of substantial probative value").

### b. Exclusion of Evidence of Aldrich's Girlfriend's Knowledge of Firearms

[¶28] Aldrich next contends that the court should have allowed him to cross-examine his girlfriend about her "familiarity with and ownership of the shooting weapon, along with other guns in general" because that evidence was relevant to his claim of self-defense. We review a court's determination of relevance for clear error. *State v. Healey*, 2024 ME 4, ¶ 13, 307 A.3d 1082.

[¶29] Prior to the girlfriend's direct testimony, Aldrich sought permission to cross-examine her about her experience with firearms and in

14

particular about her connection to the gun used in another homicide.[7]  The court limited Aldrich to queries about the witness's connection to the rifle used in the Poland shootings and to other weapons she had in her house at the time, finding that her link to a firearm used in an unrelated homicide was not relevant.

[¶30]  The court's analysis was not clearly erroneous.  Although Aldrich complains that the court prevented him from probing the girlfriend's ownership of the rifle that he used to shoot the victims, the court explicitly permitted such testimony.  Indeed, the girlfriend testified on both direct and cross-examination that before the murders she stored the rifle in her bedroom. This was consistent with Aldrich's testimony about the provenance of the gun.[8]

[¶31]  As for Aldrich's contention that he should have been allowed to ask about the girlfriend's knowledge of firearms generally, he argues only that such

---

[7] Before trial, Aldrich twice sought to compel discovery of evidence from the other homicide case. The court denied both motions without prejudice, finding that Aldrich had not demonstrated a connection between the two cases.  Aldrich does not challenge the denial of his motions to compel or otherwise argue that the court's rulings hampered his ability to present his defense.

[8] Their testimony differed, however, in one important respect: The girlfriend testified that on the night in question, Aldrich had been at her house before leaving to go to the trailer in Poland.  She was not aware that Aldrich had taken the rifle until he returned later that evening and told her to get rid of the bag with the rifle and other items inside.  Aldrich, by contrast, testified that he did not bring the gun to Poland and that it was already at the trailer when he arrived.

information was "highly relevant" to his case, without explaining how.[9] We conclude that the court did not err in determining that this evidence was not probative of any fact of consequence in this case. *See* M.R. Evid. 401.

### c.      Admission of Evidence of Aldrich's Theft of a Van

[¶32]  Next, Aldrich argues that the court erred in admitting "extensive evidence about [his] theft of a Ford Econoline van from Lowe's two days after" the murders because the evidence was irrelevant and highly prejudicial.  He posits that the "theft evidence ha[d] no relationship to the alleged murders." That contention, however, is simply not accurate under the circumstances presented here.

[¶33] We have held repeatedly that "[e]vidence of events occurring after an alleged criminal act is generally relevant if it tends to establish the defendant's state of mind.  Specifically, evidence of a defendant's effort to avoid arrest can demonstrate a consciousness of guilt, which is relevant to a fact-finder's determination of guilt," *Hassan*, 2013 ME 98, ¶ 21, 82 A.3d 86 (citations and quotation marks omitted).  *E.g.*, *State v. Wright*, 662 A.2d 198, 201 (Me. 1995); *State v. Lemay*, 2012 ME 86, ¶ 21, 46 A.3d 1113; *State v. Haji-Hassan*, 2018 ME 42, ¶ 27, 182 A.3d 145.

---

[9] Aldrich does not renew on appeal the specific argument he made below—that he should have been allowed to ask about the girlfriend's connection to the other homicide case.

[¶34] The critical question in this case was whether Aldrich intentionally and knowingly killed the two victims or whether he shot them in self-defense. A jury could reasonably infer that evidence of Aldrich's extreme efforts to avoid arrest—including the theft of a van to flee the state—demonstrated his consciousness of guilt and was inconsistent with his assertion of self-defense. *See State v. Barnes*, 2004 ME 38, ¶ 5, 845 A.2d 575; *Hassan*, 2013 ME 98, ¶ 22, 82 A.3d 86; M.R. Evid. 401. Further, although Aldrich argues that the evidence should have been sanitized to make "no reference to additional criminal conduct that was not directly related" to the murders, the court was not required to do so when evidence of the additional criminal conduct was admissible and not unduly prejudicial. *See State v. Carlson*, 304 A.2d 681, 683 (Me. 1973); *Hassan*, 2013 ME 98, ¶¶ 21, 26, 82 A.3d 86.

### d. Exclusion of Evidence of Medical Examiner's Disciplinary History

[¶35] We next review Aldrich's assertion that the court erred when it prohibited him from cross-examining the medical examiner about his record of employee discipline and a consent agreement with the Board of Licensure in Medicine.

[¶36] "We review the trial court's ruling limiting the scope of cross-examination for abuse of discretion, and will overturn such a ruling only

if it has clearly interfered with a defendant's right to a fair trial." *State v. Butsitsi*, 2013 ME 2, ¶ 13, 60 A.3d 1254 (quotation marks omitted).

[¶37] Aldrich sought permission to cross-examine the medical examiner about (1) a 2020 disciplinary finding that he displayed disruptive and inappropriate behavior and (2) a 2024 consent agreement addressing his 2023 arrest for operating under the influence at a time when he was on call for work, more than six months after conducting the autopsies in this case.

[¶38] We discern no abuse of discretion in the court's decision to prohibit Aldrich from cross-examining the medical examiner about these events. Although Aldrich urges that "[t]he information relates to [the medical examiner's] performance and . . . could have been used to question his work product," Aldrich failed to identify how the information would do so. When pressed by the trial court, Aldrich acknowledged that he had no basis to believe that the medical examiner's performance of the autopsies in this case was deficient in any way. As the trial court articulated in its ruling, use of the proffered impeachment material to suggest otherwise would run afoul of the prohibition on using information about other acts to suggest that a person acted in conformity with those acts. *See* M.R. Evid. 404(b).

[¶39] In addition, the record supports the court's finding that the medical examiner's indiscretions were not sufficiently probative of truthfulness or untruthfulness to be useful for cross-examination. *See State v. Coleman*, 2018 ME 41, ¶ 14, 181 A.3d 689 (stating that M.R. Evid. 608(b) "allows a court to permit a witness's credibility to be attacked through cross-examination on specific instances of the witness's prior conduct that are probative of truthfulness or untruthfulness" (alteration and quotation marks omitted)). Finally, to the extent that the information from the consent agreement and record of employee discipline was relevant, the court did not abuse its discretion in concluding that "any minimal relevance [was] significantly outweighed by a danger of unfair prejudice, confusion of the issues[,] misleading the jury and wasting time," *Haji-Hassan*, 2018 ME 42, ¶ 16, 182 A.3d 145.

### e. Admission of Evidence that Aldrich Fired a Gun at His Former Girlfriend

[¶40] Aldrich next contends that the court should have excluded testimony that he fired a gun at a former girlfriend because the evidence was barred by M.R. Evid. 404(b), irrelevant, and unfairly prejudicial. "We review a trial court's decision to admit evidence pursuant to Rule 404(b) for clear error and its determination pursuant to Rule 403 for an abuse of discretion."

*Williams*, 2024 ME 37, ¶ 28, 315 A.3d 714 (alterations and quotation marks omitted).

[¶41] At trial, Aldrich's former girlfriend[10] testified that she accompanied Aldrich as he fled to New Hampshire, that he was emotional during the trip, and that he made admissions to her about his involvement in the shootings. After Aldrich was arrested, the former girlfriend led the police on a high-speed chase. Over Aldrich's objection, the court allowed the State to elicit her testimony that Aldrich fired a gun at her several weeks prior to their ill-fated excursion to New Hampshire. The State offered the evidence to show that fear of Aldrich partially motivated the former girlfriend's behavior after the shootings.

[¶42] The court did not clearly err in allowing the evidence for this purpose because "Rule 404(b) does not render inadmissible evidence of other crimes, wrongs, or acts if the evidence is offered to demonstrate motive, intent, identity, absence of mistake, or the relationship of the parties," *Barnes*, 2004 ME 38, ¶ 5, 845 A.2d 575, as opposed to when the evidence is offered for an improper purpose such as to show propensity to commit certain acts, M.R. Evid. 404(b). Here, the evidence was offered to demonstrate the nature of the

---

[10] The former girlfriend is a different person from the girlfriend at the time of the murders, whose testimony we described previously.

relationship between Aldrich and the former girlfriend, thereby explaining what motivated her to aid Aldrich after the shootings and then flee from the police. This context was useful and relevant information for the jury as it considered her credibility about a critical issue: Aldrich's state of mind in the immediate aftermath of the shootings. *See State v. Hildings*, 611 A.2d 92, 93 (Me. 1992).

[¶43] Evidence admitted pursuant to Rule 404(b) is still "subject to exclusion under M.R. Evid. 403 if its probative value was substantially outweighed by the danger of unfair prejudice to defendant." *Id.* Although the disputed testimony was potentially prejudicial to Aldrich, the testimony was brief and matter of fact, and the State did not bring it up again. We conclude that the court struck the proper balance under Rule 403. *See id.* at 93-94; *State v. Shuman*, 622 A.2d 716, 718 (Me. 1993).

### f. Admission of Evidence of Aldrich's Use of a Derogatory Term to Refer to the Victims

[¶44] Aldrich next challenges the court's decision to admit evidence that he used a racially derogatory term when referring to the victims. He argues that the evidence was unfairly prejudicial under Rule 403.

[¶45] There was no abuse of discretion in the admission of this testimony. *See State v. Labbe*, 2024 ME 15, ¶ 36, 314 A.3d 162. "When relevant

and probative of an individual's actions, statements evidencing the speaker's racial animus are admissible." *State v. Eirby*, 663 A.2d 36, 38 (Me. 1995); *see also Cruzado v. Alves*, 89 F.4th 64, 75-76 (1st Cir. 2023). Here, evidence of statements Aldrich made to his former girlfriend shortly after the shootings was probative of his intent and state of mind and could therefore aid the fact finder in determining whether his claim of self-defense was credible. *See* M.R. Evid. 401; *Hassan*, 2013 ME 98, ¶ 21, 82 A.3d 86; *Eirby*, 663 A.2d at 38. Further, the court did not abuse its discretion in determining that the significant probative value of this evidence was not substantially outweighed by the danger of unfair prejudice to Aldrich. *See Cruzado*, 89 F.4th at 76; *Hassan*, 2013 ME 98, ¶ 26, 82 A.3d 86.

### g.  Unpreserved Evidentiary Claims

[¶46]  Aldrich identifies three additional purported evidentiary errors. Because Aldrich did not object to the admission of this evidence, our review is for obvious error. *See Haji-Hassan*, 2018 ME 42, ¶ 18, 182 A.3d 145. "For us to vacate a conviction based on the obvious error standard of review, there must be (1) an error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness

and integrity or public reputation of judicial proceedings." *Id.* (quotation marks omitted).

[¶47] We note at the outset that Aldrich's arguments on appeal as to these three additional errors are so underdeveloped that they are likely waived. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290 ("We will apply the 'settled appellate rule' enunciated by the First Circuit Court of Appeals that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). Nonetheless, because we perceive no error, much less obvious error, in the admission of the challenged evidence, we briefly address Aldrich's claims.

[¶48] Aldrich first contends that the court erroneously admitted evidence that he obtained ammunition in the days following the murders. Contrary to Aldrich's argument, this evidence was probative of his consciousness of guilt and was not unfairly prejudicial. *See Hassan*, 2013 ME 98, ¶¶ 21, 26, 82 A.3d 86.

[¶49] Aldrich next asserts that the court should not have allowed testimony that he used his phone to search for "porn" and for information about how to disable vehicular anti-theft systems. Aldrich's argument rests on a

partial misapprehension of the record: although the trial transcript references searches for "porn," this appears to be a transcription error, because the witness was in fact describing an exhibit showing that Aldrich used his phone to search for *pawn* shops. And we see no obvious error in the admission of evidence that Aldrich sought information about pawn shops shortly after he stole a gun and money from the victims' trailer, nor in the admission of evidence that he researched vehicular anti-theft systems before he fled in a stolen van. *See id.* ¶¶ 25-26.

[¶50] Aldrich also alleges that the court erred by waiting until just before he testified to determine which of his prior criminal convictions the State could use to impeach him.[11] Before trial, Aldrich moved in limine to prevent the State from impeaching him with any of his prior convictions. At a subsequent hearing, however, Aldrich's attorney suggested it would be best to defer a ruling on the motion until Aldrich decided whether to testify. The court agreed with this approach. "Having invited the result, [Aldrich] cannot now claim error." *State v. Wilson*, 456 A.2d 1276, 1279 (Me. 1983).

---

[11] Aldrich does not contend that the court erred in its ultimate determination about which convictions the State could use.

24

## 2.    Error

[¶51]  We next address Aldrich's challenges to three evidentiary rulings that we conclude were erroneous.  We review each ruling in turn before addressing the cumulative impact of the errors.

### a.    Admission of Evidence of Arrest in New Hampshire & Arrest Warrants

[¶52]  Aldrich argues that the court erred in admitting extensive evidence about the circumstances surrounding his arrest in New Hampshire.  He points to the testimony of three New Hampshire police officers who arrested him, the testimony of two Maine police officers who handled the evidence recovered from New Hampshire, photographs of evidence and of the arrest site in New Hampshire, and testimony of a Maine police officer that Aldrich had pending arrest warrants.

[¶53]  Aldrich objected at trial only to the testimony regarding arrest warrants and to photographs of the arrest site and an extended magazine, but not to any of the other photographs or accompanying testimony.  Accordingly, we review the court's admission of the evidence to which Aldrich did not object for obvious error.

[¶54]  We conclude that the court properly admitted the photographs of the arrest site and associated evidence.  The evidence of Aldrich's flight from

the police and disposal of the handgun and extended magazine was relevant to Aldrich's state of mind and was not "inherently inflammatory evidence that is likely to arouse the passion of the fact-finder." *Hassan*, 2013 ME 98, ¶¶ 21, 26, 82 A.3d 86; *see also supra* ¶ 48. Similarly, we perceive no error in the admission of testimony from the Maine police officers who handled the evidence recovered from New Hampshire.

[¶55]  By contrast, we conclude that the court did err when it allowed testimony that there were warrants pending for Aldrich's arrest because the testimony had minimal if any relevance and was unduly prejudicial. *See* M.R. Evid. 401, 403. Although this objection was preserved, Aldrich does not argue that the erroneous admission of this evidence alone is sufficient to warrant reversal, so we reserve discussion of the impact of the evidence for our cumulative-error analysis.

[¶56]  Finally, we determine that the court erroneously admitted excessive testimony about law enforcement's preparations for Aldrich's arrest. For example, one officer testified that he understood that Aldrich "was armed and dangerous and that it was going to be a . . . tactical takedown of him." The same officer provided detailed descriptions of the SWAT team planning for the arrest, including anticipation of a possible "hostage . . . [or] active shooter

situation." This evidence was not relevant to Aldrich's charges or his state of mind and unfairly painted him in a negative light. *See Hassan*, 2013 ME 98, ¶¶ 21, 26, 82 A.3d 86; M.R. Evid. 401, 403. We emphasize that it was appropriate to admit evidence of Aldrich's behavior, but the better course would have been to sanitize the officers' testimony regarding their planning. Because Aldrich did not object to any of this testimony, however, we do not even consider what impact the error may have had on his rights unless he first shows that it was an error "so clear under existing law that the court and the prosecutor were required to address the matter even in the absence of a timely objection." *State v. Nobles*, 2018 ME 26, ¶ 21, 179 A.3d 910 (quotation marks omitted). Given the limited scope of the testimony, Aldrich cannot satisfy this burden.

### b.    Admission of Evidence of Tip Received by Police

[¶57] Aldrich next contends that the court improperly admitted hearsay evidence in the form of testimony that the police received a tip stating that Aldrich's girlfriend had pertinent information regarding the murders and that Aldrich was "responsible for committing the homicides."[12] The State responds

---

[12] To the extent that Aldrich argues that the admission of the evidence violated his rights pursuant to the confrontation clauses of the United States and Maine Constitutions, we consider the argument undeveloped and waived. *See Mehlhorn*, 2006 ME 110, ¶ 11, 905 A.2d 290.

that evidence of the tip was "not offered for the truth but to explain" why detectives went to the girlfriend's house and ultimately to interview Aldrich in New Hampshire.

[¶58]  M.R. Evid. 801(c) defines hearsay as "a statement that: (1) [t]he declarant does not make while testifying at the current trial or hearing; and (2) [a] party offers in evidence to prove the truth of the matter asserted in the statement."  We have found error when the court admitted an "out-of-court statement for the purpose of explaining [a] trooper's conduct" because the statement constituted "inadmissible hearsay."  *State v. White*, 2002 ME 122, ¶¶ 14-16, 804 A.2d 1146; *see also State v. Ali*, 2025 ME 30, ¶¶ 9, 14, 334 A.3d 657 (holding that a court erred in allowing a detective to testify about what the defendant's family members told the police, despite the State's argument "that the testimony was not admitted for the truth but instead for its effect on the listener to provide the jury with a complete picture of the police investigation" (quotation marks omitted)).

[¶59]  In this case, although the court accepted the State's assertion at trial that it was not offering the testimony about the content of the tip for its truth, the court did not thereafter provide the jury with a limiting instruction to that effect.  "As a result, the jury was entitled to rely on the testimony to

conclude" that Aldrich's girlfriend had information about the murders, and, more problematically, that Aldrich was responsible for the murders. *Ali*, 2025 ME 30, ¶ 14, 334 A.3d 657. Accordingly, we agree with Aldrich that the court erred in admitting the tip testimony without a proper limiting instruction. *See id.*; M.R. Evid. 801(c). Here, too, Aldrich does not argue that this error alone requires vacatur. We thus analyze the impact of the error only as part of the cumulative-error discussion.

### c. Exclusion of Evidence of Threat by Adult Victim to a Third Person

[¶60] Aldrich also argues that the court erred by excluding evidence that he was aware of a threat made by the adult victim to "another known associate." "We review the trial court's exclusion of evidence for clear error or abuse of discretion." *State v. Laferriere*, 2008 ME 67, ¶ 3, 945 A.2d 1235.

[¶61] Rule 404(b) does not prohibit all evidence of prior bad acts. M.R. Evid. 404(b). Rather, "[a] defendant's knowledge of prior acts of violence [by the victim], whether witnessed by or recounted to the defendant, serves to establish that the defendant's mental judgments and physical responses during the encounter were reasonable" and may therefore be admissible. *State v. Stanley*, 2000 ME 22, ¶¶ 9-10, 745 A.2d 981; *see also State v. Dutremble*, 392 A.2d 42, 46 (Me. 1978). "When offered to demonstrate the reasonableness of a

defendant's apprehension of danger, evidence of prior violent acts is essentially proof of *the reasonableness of the defendant's belief* with respect to the violent character of the victim, and not evidence of the victim's character." *Stanley*, 2000 ME 22, ¶ 11, 745 A.2d 981.

[¶62] Here, the trial court excluded the evidence as inadmissible hearsay because it concluded that Aldrich was offering his knowledge of the threat for the truth of what was said. This was an error. Aldrich proffered that he was aware of the threat and believed that it had been made. He was therefore entitled to testify about his knowledge of the threat to support the reasonableness of his belief that the victim posed a danger to him.[13] *See id.* ¶¶ 10-11. We accordingly conclude that the court abused its discretion in excluding this evidence.

[¶63] At oral argument, Aldrich asserted that this error alone requires reversal of his conviction. We disagree. Although the court erred, we ultimately conclude that the error was harmless, for several reasons. *See State v. Quirion*,

---

[13] The court appears to have been concerned that the evidence consisted of two layers of potential hearsay—the threat that the victim made to a third party and the third party's report of that threat to Aldrich. *See Ali*, 2025 ME 30, ¶ 13, 334 A.3d 657 ("Statements containing multiple levels of hearsay are impermissible unless 'each part of the combined statements conforms with an exception to the rule' against hearsay." (quoting M.R. Evid. 805)). But neither statement was offered for its truth. It did not matter whether the victim intended to harm anyone, nor did it matter whether the third party was telling the truth when he recounted the threat to Aldrich. The information was relevant and admissible so long as Aldrich reasonably believed that the threat had been made.

2025 ME 75, ¶ 20, 340 A.3d 662. First, Aldrich's description of the alleged threat was non-specific; he asserted only that he was "aware of a threat made to another known associate that that known associate attributes to" the adult victim. Such vague information would have done little to bolster Aldrich's claimed fear. Second, Aldrich was permitted to testify that the teenage victim brandished a handgun in his presence two days prior to the murders. This personal experience, proximate as it was to the shootings, was far more relevant to the reasonableness of Aldrich's fear. Third, several friends of the victims testified that they had seen a firearm at the trailer, lending additional support to Aldrich's version of events. Fourth, as we explain more fully below, the weight of the evidence against Aldrich was overwhelming. Thus, "it is highly probable that the error did not affect the judgment." *Id.* (quotation marks omitted).

### 3. Cumulative Impact of Errors

[¶64] Finally, we address Aldrich's contention that the cumulative impact of the trial court's errors "permeated [his] trial from start to finish, placing him in an extraordinarily unfair light in the eyes of the jury." We review the impact of the three errors we have identified—(1) the admission of testimony that Aldrich had arrest warrants and was subject to a SWAT

takedown,[14] (2) the admission of the confidential tip linking Aldrich to the homicides, and (3) the exclusion of evidence that Aldrich knew that one of the victims had threatened a third party—"cumulatively and in context to determine whether the defendant received an unfair trial that deprived him . . . of due process."[15] *Williams*, 2024 ME 37, ¶¶ 45-46, 315 A.3d 714 (quotation marks omitted).

[¶65] Aldrich has failed to demonstrate that these errors affected his substantial rights. Aldrich's rather incredible claim of self-defense could not stand up to significant countervailing evidence, including but not limited to the location of the teenage victim's body, the nature of the injuries to the victims, the origin of the murder weapon, and Aldrich's conduct before and after the murders. In the face of this overwhelming evidence, the few errors that we have identified had minimal impact: the confidential tip illuminated only that Aldrich was responsible for the shootings, a fact that was uncontested; evidence that police responded aggressively to a murder suspect was unlikely to shock

---

[14] Although we have concluded that the erroneous admission of the SWAT evidence did not on its own constitute obvious error warranting reversal, *see Haji-Hassan*, 2018 ME 42, ¶ 18, 182 A.3d 145, we consider whether this testimony played a role in depriving Aldrich of a fair trial, *Williams*, 2024 ME 37, ¶¶ 45-46, 315 A.3d 714.

[15] To the extent that Aldrich argues that we should consider the court's denial of his motion to suppress and its jury instruction rulings as part of the cumulative-error analysis, we decline to do so because in neither circumstance did the court err. *See supra* ¶ 22; *infra* ¶¶ 70, 73; *Williams*, 2024 ME 37, ¶ 46, 315 A.3d 714.

or inflame the passions of the jury; the reference to the arrest warrants was made only in passing; and the vague nature of the purported threat made by one of the victims would have done little to corroborate Aldrich's claimed fear.

[¶66]  "Our ultimate task in reviewing for both harmless error and obvious error is to determine whether [Aldrich] received a fair trial." *State v. Dolloff*, 2012 ME 130, ¶ 76, 58 A.3d 1032.  Having reviewed all of Aldrich's evidentiary challenges, we are not persuaded that any errors, even when considered cumulatively, affected the jury's verdict.  Put simply, Aldrich has not demonstrated that he "received an unfair trial that deprived him . . . of due process." *Williams*, 2024 ME 37, ¶ 45, 315 A.3d 714 (quotation marks omitted).

## C.    Jury Instructions

[¶67]  Aldrich next argues that the court erred by (1) instructing the jury over his objection that it could infer consciousness of guilt from evidence that he fled after the shootings and (2) denying his request for an instruction on the justification of necessity.

### 1.    Flight Instruction

[¶68]   Aldrich contends that the court's jury instruction regarding evidence of his attempts to flee was prejudicial and "distracting from the issues before the jury."  He also complains that by referencing the issue of flight at the

end of the jury instructions, the court unfairly "highlighted this one particular aspect of the case." We review preserved challenges to jury instructions for prejudicial error, assessing the "jury instructions in their entirety to determine whether they presented the relevant issues to the jury fairly, accurately, and adequately, and we will vacate the court's judgment only if the erroneous instruction resulted in prejudice." *State v. Gaston*, 2021 ME 25, ¶ 24, 250 A.3d 137 (quotation marks omitted).

[¶69]  Regarding flight, the court instructed the jury as follows:

There's one last issue that I wish to address before we turn to the attorney's closing arguments, and that's the issue of whether the defendant fled the scene to avoid arrest or prosecution. There was evidence presented by both sides on that issue, and it's up to you to determine the facts.

If proven, flight to avoid prosecution may be evidence of consciousness of guilt. You are not required to draw such an inference, however. It is up to you, the jury, to decide what weight or effect, if any, should be given to any evidence concerning Mr. Aldrich's departure from the scene.

The court delivered this instruction after it outlined the elements of the offenses and before it explained to the jurors how to use the verdict form. The attorneys' closing arguments followed, and then the court provided final instructions before directing the jury to deliberate.

[¶70]   We conclude that the court's instruction was accurate and generated by the evidence and that it did not prejudice Aldrich's rights. *See Haji-Hassan*, 2018 ME 42, ¶ 27, 182 A.3d 145.  Here, significant evidence—that Aldrich stole a van, fled to New Hampshire, ran from police officers, and attempted to discard a firearm in the process—generated a sufficient factual predicate to support the instruction.  *See id.* ¶ 27.  Furthermore, the instruction accurately informed the jury of the law and appropriately left it to the jurors to determine what facts to find and whether to draw an inference of consciousness of guilt.  *See id.* ¶¶ 10, 28; Alexander, *Maine Jury Instruction Manual* § 6-15A at 6-31 (2025 ed.).  Finally, the court's decision to give the instruction after its recitation of the elements of the offense and before its discussion of the verdict form did not unfairly highlight evidence of Aldrich's flight or otherwise cause prejudice.  *See State v. Rosario*, 2022 ME 46, ¶ 29, 280 A.3d 199.

## 2.   Necessity-Defense Instruction

[¶71]  Aldrich also argues that the court erred when it denied his request to instruct the jury that "necessity" is a defense to the charge of possession of a firearm by a prohibited person.

[¶72] "We review for prejudicial error the trial court's denial of a request for jury instructions," *Gaston*, 2021 ME 25, ¶ 24, 250 A.3d 137, but "[o]ur review of the trial court's interpretation of a justification defense is de novo," *State v. Cardilli*, 2021 ME 31, ¶ 15, 254 A.3d 415. "A party can demonstrate that the court erred by failing to give a requested instruction only when the instruction (1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing; and (4) is not otherwise sufficiently covered in the court's instructions." *Gaston*, 2021 ME 25, ¶ 24, 250 A.3d 137 (quotation marks omitted).

[¶73] In this case, Aldrich's requested instruction[16] did not state the law correctly because the common law defense of necessity is no longer available in Maine. *See State v. Demerchant*, 2025 ME 49, ¶ 18, 339 A.3d 765; *State v. Poole*, 568 A.2d 830, 832 (Me. 1990). Rather, the Legislature's adoption of the competing-harms justification, 17-A M.R.S. § 103 (2025), "was designed to codify the principle inherent in the common law defense of necessity."

---

[16] Aldrich's proposed jury instruction is not in the trial court's file. Nonetheless, the trial transcript shows that Aldrich repeatedly asked for a "necessity" instruction and relied for support on *United States v. Penn*, 969 F.3d 450 (5th Cir. 2020), which sets forth "'justification' as a defense to a felon-in-possession charge," *id.* at 455 (quoting *United States v. Harper*, 802 F.2d 115, 117 (5th Cir. 1986)).

*Demerchant*, 2025 ME 49, ¶ 18, 339 A.3d 765 (quotation marks omitted). Accordingly, the court did not err in declining to give the instruction.

[¶74]   Even if we were to construe Aldrich's request as one for a competing-harms instruction, we would conclude that there was insufficient evidence to generate that justification, which requires, inter alia, "evidence that the defendant's conduct was necessary because of a specific and imminent threat of injury to the defendant or another leaving no reasonable alternative other than violating the law." *Id.* ¶ 19 (emphasis and quotation marks omitted). Aldrich wanted the court to instruct the jury that it could consider whether he possessed a firearm due to a threat of imminent harm, but by his own admission, he took a handgun from the trailer after shooting the victims and maintained possession of the firearm until he was arrested in New Hampshire, long past the time he could have faced any specific and imminent threat of injury.  Thus, even viewing the evidence in the light most favorable to Aldrich, it was not "sufficient to make the existence of all facts constituting the competing harms justification a reasonable hypothesis for the fact finder to entertain." *Nobles*, 2018 ME 26, ¶ 31, 179 A.3d 910 (quotation marks omitted).

**D.    Sentencing**

[¶75]  Finally, Aldrich argues that his sentence must be vacated because the court found facts that lacked evidentiary support and failed to consider mitigating factors in determining the final sentence.  We reject each of these contentions.

[¶76]  A court imposing a sentence for murder must follow the two-step process set forth in 17-A M.R.S. § 1602(1)(A)-(B), (2) (2025).[17]  "First, the court determines the basic term of imprisonment based on an objective consideration of the particular nature and seriousness of the crime.  Second, the court determines the final period of incarceration based on the relevant aggravating and mitigating factors."  *State v. Sweeney*, 2019 ME 164, ¶ 17, 221 A.3d 130 (citation and quotation marks omitted).  To justify the imposition of a life sentence, the sentencing court must find that "'the murder is accompanied by aggravating circumstances,'" including, as relevant here, premeditation-in-fact and murder for pecuniary gain.  *State v. De St. Croix*, 2020 ME 142, ¶ 6, 243 A.3d 880 (quoting *State v. Shortsleeves*, 580 A.2d 145, 149 (Me. 1990)); *see State v. Waterman*, 2010 ME 45, ¶ 44, 995 A.2d 243.

---

[17]  Title 17-A M.R.S. § 1602(1)(B) has been amended since the court imposed Aldrich's sentence, though not in any way that affects the present appeal.  *See* P.L. 2025, ch. 402, § 1 (effective Sept. 24, 2025) (to be codified at 17-A M.R.S. § 1602(1)(B) (2026)); P.L. 2025, ch. 420, § 1 (effective Sept. 24, 2025) (to be codified at 17-A M.R.S. § 1602(1)(B) (2026)).

[¶77] We review the court's determination of the basic sentence de novo for misapplication of legal principles, *Sweeney*, 2019 ME 164, ¶ 17, 221 A.3d 130, the court's factual findings for clear error, *see State v. Goncalves*, 2025 ME 70, ¶ 43, 340 A.3d 639, and the court's determination of the final sentence for abuse of discretion, *Sweeney*, 2019 ME 164, ¶ 17, 221 A.3d 130.

[¶78] The court held a sentencing hearing on November 22, 2024. After considering the nature and seriousness of the offense and finding that aggravating circumstances existed because the murders were premeditated, were for gain, involved multiple deaths, and involved the use of a firearm by a prohibited person, the court set a basic sentence of life. The court then identified several aggravating factors, among them the impact of the crimes on the victims' families, Aldrich's untruthful trial testimony,[18] and Aldrich's lengthy criminal history. The court found that there were no mitigating factors before ultimately imposing concurrent life sentences for the murder convictions.

### 1. Basic Sentence

[¶79] Aldrich attacks the court's factual findings on the basis that there was no reliable evidence that these murders were premeditated or for gain. Yet

---

[18] The court emphasized "the falsity with which [Aldrich] testified" and "his blatantly untruthful claim of self-defense."

the record, in the form of evidence that Aldrich told a friend he planned to "do a job," brought the murder weapon to the trailer, and left the scene with a significant amount of cash, shows otherwise. We therefore discern no error in the sentencing court's fact finding and decision to set the basic sentence at life. *See De St. Croix*, 2020 ME 142, ¶¶ 11-12, 243 A.3d 880.

### 2. Mitigating Factors

[¶80] We also conclude, contrary to Aldrich's argument, that the court did not "summarily dismiss[]" his presentation of mitigating factors or otherwise abuse its discretion when it stated, "I don't find there to be any real mitigating factors, let alone factors that impacted my analysis to any substantial degree."

[¶81] "[T]he selection for appropriate emphasis among [the] disparate purposes [of sentencing] rests in the discretion of the court," *State v. Hamel*, 2013 ME 16, ¶ 8, 60 A.3d 783 (quotation marks omitted), and we accordingly "afford the court significant leeway in what factors it may consider and the weight any given factor is due when determining a sentence," *State v. Bentley*, 2021 ME 39, ¶ 11, 254 A.3d 1171. "The court is not required to discuss every argument or factor that the defendant raises, as long as it does not disregard

significant and relevant sentencing factors." *Reese*, 2010 ME 30, ¶ 34, 991 A.2d 806.

[¶82] Here, Aldrich cited as mitigating factors his history of drug use and his attempts to support his family and start a business. The court stated that it reviewed Aldrich's sentencing memo and had considered his arguments. It acknowledged that Aldrich had close family connections but concluded that he rarely had been gainfully employed and had made no real effort to address his substance use. No more was required. *See id*. The court's ultimate decision not to accept Aldrich's mitigation arguments does not require vacatur of the sentence. *See id.*

The entry is:

Judgment affirmed.

---

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Camden, for appellant Aaron Aldrich

Aaron M. Frey, Attorney General, and Katie Sibley, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket No. CR-2023-420
FOR CLERK REFERENCE ONLY